## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

JAMES J. ELLENBECKER,

               Plaintiff,

vs.

BNSF RAILWAY COMPANY, a
Delaware corporation,

               Defendant.

4:19-CV-3038

MEMORANDUM & ORDER

James Ellenbecker sued his former employer, BNSF Railway Co., under the Federal Employers Liability Act (FELA), 45 U.S.C. § 51 *et seq*., alleging that when his train traveled over the West KAAPA mainline switch and crossing on March 5, 2017, rough track resulting from BNSF's negligence caused serious injury to his right occipital nerve.

This matter is before the Court on cross-motions for summary judgment and motions to exclude expert testimony. Ellenbecker moves for partial summary judgment on the issues of causation (filing 97) and negligence (filing 108) under FELA. BNSF moves for summary judgment (filing 100) arguing that Ellenbecker cannot establish a prima facie claim of negligence. BNSF also moves to exclude or limit the testimony of Ellenbecker's safety expert (filing 103) and medical expert (filing 105). All of these motions draw upon the same or similar material facts and will be resolved together.

As explained below, Ellenbecker's motion for partial summary judgment on the issue of causation will be granted. And BNSF's motions to exclude or limit the expert testimony of safety expert Brian Hansen and medical expert Dr. Bennett Machanic will be granted in part and denied in part. All other

motions presently before the court will be denied and the case will move forward to trial.

## I. BACKGROUND

### ELLENBECKER'S INJURY

Ellenbecker was a locomotive engineer for BNSF and operated trains primarily along the route from Lincoln, Nebraska to McCook, Nebraska. Filing 102-2 at 6. As an engineer, Ellenbecker maintained the speed of the train, watched for air pressure, and monitored the track for anything unusual that might impede the train's movement. *See* filing 102-2 at 6.

On the evening of March 4, 2017, Ellenbecker operated a train traveling from Lincoln to McCook. Filing 102-2 at 11. Brent Schaefer was the conductor for the trip and rode in the cab with Ellenbecker. Filing 102-2 at 11, 16. Sometime during the early morning hours of March 5, 2017, the train traveled over a stretch of track between Minden and Axtell, Nebraska near a KAAPA ethanol distillery, commonly referred to as the West KAAPA switch. *See* filing 102-2 at 12-13; *see also* filing 102-4. A switch allows a train to be diverted off one line of track and onto another—here, the West KAAPA switch provided access to a small section of track used by the KAAPA facility to load and unload freight cars. *See* filing 102-2 at 13; filing 102-4.

Ellenbecker testified that as the train approached the switch, he saw a familiar small s-curve on the main line track which he had seen many times before. Filing 102-2 at 13-15; filing 102-5 at 3. As the train traveled over the switch, Ellenbecker testified it got thrown side-to-side, "a little more than normal" and he "felt a snap, like, about an inch behind [his right] ear [] at the base of his skull," that caused a burning sensation. Filing 102-2 at 15, 17. He didn't think much of it at the time, but told Schaefer that something had

happened and he thought "something just snapped on [his] skull."[1] Filing 102-2 at 15, 17. Ellenbecker was able to continue running the train to McCook, and when he got there he went to his hotel room and slept. Filing 102-2 at 18.

When asked whether what he experienced that morning was different than the many other rides he had taken over the switch, Ellenbecker testified "I don't know. I don't recall it being any different. [The train swaying from side to side] was always there. It was apparently a little more violent." Filing 102-2 at 15, 18. He also testified that the West KAAPA switch was a little more rough than going over other switches, and had been for a long time. Filing 102-2 at 16, 18, 20. But he said he treated it like any other switch and never reduced the train's speed or made sure he was sitting down to cross it. Filing 102-2 at 17.

On the evening of March 5,[2] Ellenbecker engineered a train back to Lincoln. Filing 102-2 at 19. On the return trip, he went over the West KAAPA switch just as he normally would and testified that he experienced "[t]he usual rocking back and forth." Filing 102-2 at 20. When he arrived back in Lincoln early on the morning of March 6, Ellenbecker reported his injury to the superintendent. Filing 102-2 at 20-21. By that time, he was experiencing soreness at the base of his skull and on the right side of his head behind his ear. Filing 102-2 at 20. On the report, Ellenbecker wrote his injury occurred because of a "rocking motion" over the West KAAPA switch. Filing 102-6.

---

[1]     Schaefer apparently provided a statement during BNSF's investigation of Ellenbecker's injury, *see* filing 110-4 at 4, but it appears nowhere in the record and neither party relies on it.

[2]     Unless otherwise specified, the dates in the background section refer to 2017, the year of Ellenbecker's injury.

Immediately after the incident, Ellenbecker's symptoms were mild—he still had a burning sensation behind his right ear, some soreness, and some tingling in his right pointer finger. *See* filing 102-2 at 8, 19; filing 99-2 at 8. On March 7, Ellenbecker went to his regular medical provider, Anne Bruna, APRN, to get checked out. Filing 99-4 at 2-3. She diagnosed him with "cervical neck pain with some right radicular symptoms and right second finger numbness." Filing 99-4 at 4. A few days later, Bruna scheduled Ellenbecker for an MRI at his request and referred him to a neurologist for further evaluation. Filing 99-4 at 4.

In November of 2017, Ellenbecker saw neurologist James Bobenhouse, M.D. Filing 99-5 at 3. He was diagnosed with right neck and greater occipital pain due to muscle strain with probable superimposed greater occipital neuritis (inflammation or injury to the nerve). Filing 99-5 at 4.

Ellenbecker testified that beginning in early 2018 his symptoms got worse—he had "electric shock-like" feelings beginning at the right occipital region, near the base of the skull, along the right side of his scalp and ending just behind his right temple that started waking him up at night. Filing 102-2 at 8. In February 2018, Ellenbecker quit his engineering job with BNSF because of his pain. *See* filing 107-4 at 1; filing 107-2 at 46-47.

In October of 2018 Ellenbecker went to the Mayo Clinic. Filing 99-6 at 3. Mark Whealy, M.D. (a board-certified neurologist with a subspecialty in headache medicine) and Jacqueline Duvall, M.D. (a headache fellow at Mayo) evaluated Ellenbecker. Filing 99-6 at 2. In addition to the electric shock-like pain, Ellenbecker reported a constant dull aching pain in the right occipital and temporal regions. Filing 99-6 at 3. He also complained of headaches with nausea, wavy lines in his right-side vision, and constant ringing in his right ear. Filing 99-6 at 3. Ellenbecker said that movement and activity, sitting for

prolonged periods, fatigue associated with his shift work as an engineer, and bright lights seemed to trigger and exacerbate his pain. *See* filing 99-6 at 3. Dr. Whealy noted that Ellenbecker's electric-shock-like pain "could be related either to a right lesser occipital neuralgia or cervicogenic headache after a whiplash injury." Filing 99-6 at 4. Dr. Duvall opined that Ellenbecker's headaches could be "attributed to prior whiplash injury in the setting of a medication overuse," and the shock-like pain "suggest[ed] of a lesser occipital neuralgia." Filing 99-6 at 4. Ultimately, Ellenbecker was diagnosed with lesser occipital neuralgia. *See* filing 99-8 at 3-4, 8.

Ellenbecker continued treatment at the Mayo Clinic with several other doctors throughout 2019 and 2020. *See* filing 99-6 at 5. He received two rounds of Botox injections to try and reduce the frequency of his headaches and underwent a pulsed radiofrequency ablation procedure (burning of a nerve). Filing 99-6 at 5. And Ellenbecker was also prescribed a variety of medications to try and curb his nerve pain and headaches. Filing 99-6 at 6.

At the time of Ellenbecker's deposition in October 2019, his symptoms had progressed even further. The sometimes painful electric shocks occurred 40 to 50 times per day and woke him up as many as four or five times per night. Filing 102-2 at 8-9. Ellenbecker also continued to experience painful migraines across the front of his head. Filing 102-2 at 8.

CONDITION OF THE TRACK NEAR THE WEST KAAPA SWITCH ON MARCH 5, 2017

Ellenbecker claims that BNSF's negligent maintenance of the track at the West KAAPA switch and crossing caused his injury. *See* filing 121 at 1-3. So, evidence of the condition of the track on March 5 is central to the resolution of this dispute.

To begin, it will be helpful to discuss the precise location and nature of the track at the West KAAPA switch. The switch is located at milepost 195.559 and a public road crossing is located at milepost 195.560. Filing 102-8 at 2; filing 110-4 at 5; filing 102-7 at 6. The section of track including the West KAAPA switch and crossing is rated Class 4, subjecting it to the Federal Railroad Administration (FRA) standards for that class of track. *See* filing 102-7 at 9; filing 102-16 at 8; filing 102-13 at 2. And in 2017 it was also classified as a "key route" by BNSF because ethanol trains, considered hazardous, traveled the route. Filing 102-15 at 8; filing 102-16 at 4. Key routes were subject to additional inspections under BNSF internal policies. Filing 102-15 at 8. Two Amtrak trains and about 10 to 15 BNSF freight trains traveled over the West KAAPA switch and crossing each day. Filing 102-16 at 8.

On March 6, the day after the incident, James Matthews, BNSF claim officer, conducted an investigation at the West KAAPA switch and crossing. *See* filing 110-4 at 4. During that investigation he took a series of photos. Filing 110-5; *see also* filing 110-4 at 3. Matthews also collected video footage from a forward-facing camera that was attached to the locomotive Ellenbecker was operating on March 5. *See* filing 102-24. And a BNSF track foreman and truck driver examined the area and did not document any track abnormalities. *See* filing 110-4 at 6, 9. But there is no evidence they took any track measurements. *See* filing 110-4 at 9; filing 102-17 at 111.

The photos were discussed with various BNSF employees during their depositions. BNSF track inspector Chris Brisbin, roadmaster Justin Cowper, and division engineer Mark Boyer were all responsible for the West KAAPA

switch, and testified that it is impossible to diagnose track defects[3] from a photo alone. Instead, you have to go out and inspect in person. Filing 102-16 at 11; filing 102-7 at 27; filing 110-6 at 8-9. So, the photos are only so helpful in understanding the condition of the track on March 5.

BNSF proactively monitors track conditions in multiple ways. First, BNSF requires engineers and other employees riding track to report any issues that they believe are dangerous. Filing 102-2 at 7. Ellenbecker knew of this requirement, filing 102-2 at 7, 24, but he never reported any issues with the West KAAPA switch prior to his injury, and he testified he believed it was safe, filing 102-2 at 14, 17, 24. Nor did Ellenbecker make a rough track report after his injury, either on the remainder of the trip to McCook or on his return trip to Lincoln. Filing 102-2 at 17, 20-21. And Ellenbecker testified that when he traveled over the switch after March 5, he never believed it was unsafe. Filing 102-2 at 24. Still, Ellenbecker testified "there was obviously something wrong with [the switch on March 5] to make us move that badly." Filing 102-2 at 15.

According to Ellenbecker, he did not report the switch because "this track is ridden daily by a track inspector," and he assumed if it was good enough for Amtrak, which transports people, it was good enough for freight trains like his. Filing 102-2 at 18. He elaborated that he thought BNSF probably already knew about the switch being rough, but also admitted he didn't know anyone who had made a report. Filing 102-2 at 18. Ellenbecker also testified that he had reported other issues with track and equipment during his career with BNSF. Filing 102-2 at 24.

---

[3]     "Defect" is used throughout this opinion to reflect a term of art in the railroad industry and used by the witnesses to mean a condition that violates FRA regulations. *See* filing 102-17 at 112-13. "Deviation" is used where the track still complies with the FRA regulations but is approaching the level of defect. *See id.*

BNSF does get reports of rough track from Amtrak. *See* filing 102-7 at 14. The only rough track report anywhere near the date of Ellenbecker's injury, from either BNSF or Amtrak, was received on August 3, 2016 from an Amtrak train regarding milepost 195. Filing 102-7 at 14; filing 102-11. After that report was received, track inspector Brisbin went out to examine that area of track[4] and couldn't find any defects. Filing 102-7 at 14. But BNSF required a speed restriction be entered until a roadmaster could verify that there was no defect. Filing 102-7 at 14-15. Cowper, roadmaster in charge of the area and Brisbin's supervisor, *see* filing 102-7 at 3, 6, testified that he verified the inspection and lifted the speed restriction. Filing 102-7 at 15.

BNSF also has an entire department dedicated to maintaining the safety of its track. *See* filing 102-7 at 5, 19; filing 102-15 at 3. According to the FRA standards, Class 4 track should be inspected twice per week, 49 C.F.R. § 213.233(c), and Brisbin testified he inspected the track four times a week because BNSF classified it as a key route. Filing 102-16 at 4, 8. Brisbin also testified that he performed walking inspections of the section of track near the West KAPPA switch once per month.[5] Filing 102-16 at 4. Multiple track inspections of the West KAAPA switch were completed around the time of Ellenbecker's injury.

On February 15, 2017 Brisbin had performed a walking inspection of the switch and documented no defects or other issues. Filing 110-7 at 8. After Ellenbecker's injury, on March 21, Brisbin walk-inspected the switch again

---

[4]  It is standard for the inspector to check the location of the rough track report and a quarter mile in each direction, because it is assumed that the reported milepost may not be accurate. *See* filing 102-7 at 15.

[5]  FRA regulations permit inspections to be "made on foot or by traversing the track in a vehicle at a speed that allows the person making the inspection to visually inspect the track structure for compliance. . . ." 49 C.F.R. § 213.233(b).

and found some loose rod bolts and a missing guard rail plate. Filing 102-16 at 5. He requested a repair of the defects within 30 days. Filing 102-16 at 5.

On March 30, Ellenbecker took another trip from Lincoln to McCook, but this time his train stopped in Hastings to pick up Brisbin. Filing 102-2 at 22; filing 102-16 at 2, 10. Ellenbecker testified that Brisbin had been assigned to inspect the KAAPA switch because "somebody" had turned in a personal injury report. Filing 102-2 at 22. But Ellenbecker did not believe that Brisbin realized that the "somebody" was him. Filing 102-2 at 22-23; *see also* filing 102-16 at 7. By that time, Ellenbecker had "learned to brace [himself] when [he] went over that switch," but he did not mention that to Brisbin. Filing 102-2 at 23. According to Ellenbecker, as they traveled over the switch that day, Brisbin "blurted out a cuss word and said, 'That's really bad.'" Filing 102-2 at 23. Ellenbecker also testified that Brisbin told him he would put in a speed restriction and have the track repaired. Filing 102-2 at 23.

But Brisbin testified differently. According to Brisbin, he was riding the train that day because it was a quarterly requirement, and March 30 was the last day of the quarter. Filing 102-16 at 7. The ride was only the second time in his career Brisbin had ridden a train over a section of track he inspected, and Brisbin testified he had no idea what it felt like to ride over a switch. Filing 102-16 at 7, 11. Brisbin recounted that as the train traveled over the switch, "it rocked back and forth," and when it got to the crossing "it dip[ped] down"— a combination of movements that surprised him. Filing 102-16 at 7.

Because Brisbin always saw train movement "on the outside," he couldn't say whether the movement that day was unusual. Filing 102-16 at 7, 11. When he had seen trains bounce before and contacted them to ask if the track was bad, drivers reported it was "just fine." Filing 102-16 at 7. And Brisbin testified if he thought the motion was dangerous, he would have submitted a slow

order—but that he didn't, and never told Ellenbecker that he would. *See* filing 102-16 at 11.

Brisbin went back out on April 4 and the bolts and guard rail he'd reported in February had been fixed, but he documented inadequate ballast drainage and ties not effectively distributed. Filing 102-16 at 5. These were designated as non-class defects, meaning that Brisbin did not have to immediately reduce the track speed. But the defects would have to be repaired within 30 days or a speed restriction would be required. *See* filing 110-13 at 13

Brisbin testified that the ballast and tie defects he documented on April 4 existed at the time of Ellenbecker's injury, and likely well before March 5, but had not been reported. Filing 102-16 at 5; filing 110-7 at 8. He also said that drainage and mud at the West KAAPA crossing were recurring problems because of the heavy truck traffic in and out of the ethanol plant. Filing 110-7 at 5. And he testified that poor drainage can affect ballast, tie, and track surface maintenance. Filing 110-7 at 4. Similarly, Cowper testified that mud holes can affect track geometry, but that not every mud hole is an issue. Filing 110-13 at 7-8.

According to Brisbin, he didn't report the defects earlier because they weren't likely to get fixed. First, during the winter the ground is frozen, so ballast and tie defects can't be addressed without creating "a bigger mess than what already is there." Filing 102-16 at 6. And second, BNSF didn't have enough surfacing gangs available in the spring to fix all of the reportable non-class defects within the 30-day time period required by FRA standards. *See* Filing 102-16 at 6. So, the inspectors "pick and choose [their] battles," and expect that "most of the time you're going to get a Band-Aid put on it because . . . you can't get all the equipment and everything there to properly tear the crossing out and cut it down the way it's supposed to be done." Filing

102-16 at 6. He reported the West KAAPA switch on April 4 because "that was probably one of our worst areas, so that's where we started." Filing 102-16 at 6; filing 110-14; *see also* filing 110-14; filing 110-13 at 5-6.

In addition to rough track reports and inspections, BNSF uses special train cars called geometry cars to inspect track. Filing 102-13 at 3. These cars use lasers to measure the precise geometry of the track and report deviations in track surface, alignment, and gage (measurement between rails) as well as rail wear. Filing 102-13 at 3. The geometry car then generates various reports with "red tags" and "yellow tags." *See* filing 102-13 at 11.

A red tag means the track violates FRA standards and requires verification by a track inspector within 24 hours. Filing 102-7 at 11. If the red tag defect is verified by field measurements, the speed on the track will be reduced until the track can be repaired. Filing 102-7 at 11. A yellow tag means the track still complies with FRA standards, but may require future attention. *See* filing 102-16 at 27-28. BNSF internal policy requires an inspector to perform a walking inspection to confirm all yellow tags within 30 days. *See* filing 102-13 at 12; filing 110-6 at 9-10. But Brisbin testified that he was not held accountable for performing those walking inspections, and would only inspect if there was a "problem starting in [the] area." Filing 102-16 at 8; filing 110-7 at 6.

On February 27, 2017, six days before Ellenbecker's injury, a geometry car rode over the track at the West KAAPA switch and reported two yellow tags at mileposts 195.550 and 195.554. Filing 102-7 at 8-10; filing 102-10. The tags were gage deviations—the first for gage wide wood of 7/8 of an inch for two feet, and the second for gage change of negative 7/8 inch for 17 feet. *See* filing 102-10; filing 102-7 at 9-11. And the yellow tag deviations were about 47.5 feet and 26.5 feet east of the switch, respectively. *See* filing 102-7 at 6, 9;

- 11 -

filing 110-6 at 6. In other words, Ellenbecker's train traveling from Lincoln to McCook would have traveled over the yellow tag deviations immediately before the switch. *See* filing 102-7 at 9.

No repairs were made in response to these yellow tags prior to Ellenbecker's injury. *See* filing 102-7 at 17. But Cowper and Boyer, division engineer for the area and Cowper's supervisor, testified that if track is meeting the geometry criteria set by the FRA it is safe for train travel. Filing 102-7 at 28; filing 102-15 at 8.

Finally, BNSF uses train cars equipped with special vehicle/track interaction technology. Filing 102-25 at 1; filing 102-13 at 14-15. The technology can identify train accelerations and impacts to the train axle that may be caused by track irregularities. *See* filing 102-25 at 1. And the technology measures lateral and vertical train motion and documents when those motions exceed certain thresholds. *See* filing 102-25 at 1-2. In other words, the vehicle/track interaction technology is specifically designed to detect irregularities in the bounce or side-to-side sway of a train. *See* filing 102-25 at 2.

On February 28, 2017 a train equipped with the vehicle/track interaction technology traveled from Lincoln, and headed west over the stretch of track including the West KAAPA switch and crossing. Filing 102-25 at 2. The train did not report any irregularities at the location of Ellenbecker's injury. Filing 102-25 at 2, filing 102-26.

In addition to BNSF monitoring its track for safety, the FRA also employs inspectors to ensure railroad compliance with its standards. *See* filing 110-19. On April 6, 2017, Bernard Roskilly, an FRA inspector, walked the section of track between mileposts 187 and 204 that includes the West KAAPA switch. *See* filing 110-19. Notably, Roskilly documented many locations along

the stretch that had fouled ballast and drainage problems, but did not identify a problem at the switch or crossing. *See* filing 110-19. The closest locations with documented issues were mileposts 194.5 and 196.5. Filing 110-19 at 3. And none of the problems rose to the level of FRA violations or required a reduction in the class of track. *See* filing 110-19 at 5.

There is some evidence that BNSF had planned repairs to the switch and crossing before Ellenbecker's injury.[6] For example, BNSF allocated funding for

---

[6]      There is evidence that BNSF did extensive repairs to the switch and crossing in April and May 2017 after Ellenbecker's injury. *See* filing 110-15; filing 110-13 at 6; filing 102-7 at 20-21, 27. But evidence of subsequent remedial measures is strictly inadmissible to prove negligence. Fed. R. Evid. 407. The Court may admit this evidence for another purpose, such as impeachment or—*if disputed*—proving ownership, control, or the feasibility of precautionary measures. Fed. R. Evid 407 (emphasis supplied).

Ellenbecker relies on *Cupp v. Nat'l R.R. Passenger Corp.*, 138 S.W.3d 766, 776–77 (Mo. Ct. App. 2004) for the proposition that if a defendant knew of the dangerous condition prior to the accident and had also tried or proposed the repairs prior to the accident, then evidence that they completed the repairs after the accident is not barred under Rule 407. But in *Cupp* there was *no question* about whether the condition was dangerous–heavy sets of locomotive wheels were run through a wheel wash *known* to have no way to slow down the wheels because it hadn't been fully set up. *Id.* at 770. And *Cupp* also is a case where the "subsequent remedial measure" was planned in advance because the remedial measure was actually just installing functional brakes on the brand new wheel wash. *See id.*

And the same distinction can be made for the other cases plaintiff relies upon. *See Schmeck v. City of Shawnee*, 651 P.2d 585, 600 (Kan 1982) ("[T]he parties merely *completed* something which had been *started* long before plaintiff's accident."); *Raymond v. Raymond Corp.*, 938 F.2d 1518, 1523 (1st Cir. 1991) (evidence of new product model "on the drawing board" before accident that corrected safety risks was not a *subsequent* remedial measure).

Here, as explained in more detail in the Court's discussion of the cross motions for summary judgment, there is simply not the same kind of indisputable evidence of a known

---

maintenance work on the West KAAPA crossing as early as 2015. *See* filing 110-6 at 6. And in April 2016, an email request was made to upgrade the crossing, that was "once again needing attention," due to heavy traffic use. Filing 102-14 at 2. BNSF responded that it was going to send roadmaster Cowper out to look at the crossing. Filing 102-14 at 1.

And ballast rock was delivered at the crossing on March 3, 2017, just two days before Ellenbecker's injury. Filing 110-12 at 1; filing 110-7 at 6 *see* filing 110-5 at 21. Cowper testified that the ballast was delivered to the crossing as a good staging ground between Hastings and Holdrege, Nebraska to be used for any maintenance necessary in the area. Filing 110-13 at 4. But he also testified it was to be used for maintenance on the switch and crossing. Filing 110-13 at 4.

EXPERT OPINIONS – TRACK SAFETY

After suit was filed, both parties sought opinions from experts on the safety of the West KAAPA switch and crossing at the time of Ellenbecker's injury. Ellenbecker retained Brian W. Hansen, former Union Pacific Railroad track manager and supervisor. *See generally* filing 102-18. BNSF retained Lewis F. (Fred) Dennin II, former track safety inspector and regional administrator for the FRA. *See generally* filing 102-20. And BNSF also retained Brian T. Weaver, a biomechanical engineer, filing 102-28, to opine on the movement Ellenbecker likely experienced when he traveled over the switch and crossing on March 5, and whether that movement was reasonably safe. *See generally* filing 102-29.

---

*danger* and advanced plans to fix that specific danger. So, the Court is not convinced that evidence of BNSF's subsequent repairs to the switch and crossing are admissible.

Ellenbecker's expert, Hansen, reviewed the pleadings, deposition transcripts, documents produced by BNSF, photographs, FRA standards, BNSF policies, and other railroad industry standards to prepare his expert report. Filing 102-18 at 1-2. Hansen opined that the West KAAPA switch and crossing were not reasonably safe because, in part, BNSF did not maintain clean ballast and track geometry in compliance with BNSF internal policies, FRA standards, and accepted industry practices. *See* filing 102-18 at 25-26. He emphasized that the FRA standards provide the bare minimum of maintenance requirements and that to ensure good ride quality, railroads must do better than the minimum. *See* filing 102-17 at 157. And the FRA Compliance Manual expresses the same view of its standards. *See* filing 102-20 at 28.

Hansen also concluded that BNSF was not following its own internal policies regarding track inspections and therefore was not detecting and correcting deviations in accordance with industry standards. *See* filing 102-18 at 26. Ultimately, Hansen opined that the combination of failures in track geometry, fouled ballast, and lack of inspection resulted in an unsafe workplace for Ellenbecker and other BNSF employees. *See* filing 102-18 at 25-26; filing 102-17 at 159-60. And he testified that the combined deficiencies could have led to Ellenbecker's experience of a violent rocking motion on March 5. Filing 102-17 at 173-74.

In preparing his opinions and report, Hansen also inspected the West KAAPA switch and crossing in person on April 7, 2020. Filing 102-18 at 6. During that inspection Hansen observed fouled ballast "throughout the crossing," and an alignment deviation in the switch "just east of the guard rail across from the frog in the turnout." Filing 102-18 at 6; filing 102-17 at 96.

These conditions, Hansen testified, were indicative of a chronic and recurring problem with drainage at the switch and crossing. *See* filing 102-17 at 96, 106, 129-130. Hansen pointed to the April 2016 email requesting repairs to the crossing "once again," the pictures taken on March 6 following Ellenbecker's injury that showed mud, *see*, *e.g.* filing 110-10, and his own inspection three years later that revealed fouled ballast and mud. *See* filing 102-17 at 129-30, 145-46. According to Hansen, every crossing should have pipes with weep holes underneath it that drain moisture away from the crossing and track, and the West KAAPA crossing did not. Filing 102-17 at 147. And Hansen testified that the lack of drainage made the switch and crossing unsafe. Filing 102-17 at 149.

BNSF expert Fred Dennin also reviewed the pleadings, deposition transcripts, documents produced by BNSF, photographs, FRA standards, and BNSF policies to prepare his opinion. *See* filing 102-20 at 3-7. In addition, Dennin responded point by point to Hansen's expert report. *See* filing 102-20 at 19-34. In essence, Dennin opines that the track at the West KAAPA switch and crossing on March 5, 2017 complied with the FRA standards and was therefore safe for operation at Class 4 track speeds.[7] *See* filing 102-20 at 34. Dennin suggests that Hansen's conclusion that poor drainage and fouled ballast were recurring at the crossing is speculative. *See* filing 102-20 at 20, 32. And Dennin opined that the geometry car measurements from February 27 showed that whatever the condition of the ballast was at that time, the track was safe for train travel. *See* filing 102-20 at 31.

---

[7]   As discussed below, whether or not the track complied with FRA regulations is a legal conclusion and outside the scope of admissible expert testimony. But for current purposes, Dennin's entire opinion is explained.

Finally, Weaver conducted an accident reconstruction and biomechanical evaluation for BNSF. *See* filing 102-29 at 3. Weaver reviewed Ellenbecker's medical records, pleadings, deposition transcripts, documents produced by BNSF, and photographs to prepare his opinion. *See* filing 102-29 at 3-4. Weaver opined, based on his calculations, that Ellenbecker's locomotive experienced primarily lateral sway when going over the West KAAPA switch and crossing on March 5. Filing 102-29 at 5. According to Weaver, Ellenbecker's head "moved slightly to the left and right," and the movement was "similar to or less than those experienced during simple and vigorous activities of daily living, and well below known injury thresholds." Filing 102-29 at 5. And so Weaver also concluded that BNSF provided Ellenbecker with a reasonably safe work environment. Filing 102-29 at 5.

ELLENBECKER'S RELEVANT MEDICAL HISTORY

Medical records indicate that Ellenbecker had a history of nerve pain, headaches, tingling, and numbness on his right side—symptoms similar to those he had immediately after the March 5 incident, and those he experiences now.

Dr. Bobenhouse saw Ellenbecker several times over the years, starting in January 2000 for headaches on the right side of his head, and again in March 2000 for headaches in the front of his head and a pressure-type-feeling around the right ear and behind the right eye. Filing 117-2 at 3-4. Bobenhouse also treated Ellenbecker shortly after a train/truck accident in April 2009 for right hand tingling and right neck and shoulder pain. Filing 117-2 at 4. At that time Ellenbecker also complained of headaches throughout the head, and was ultimately diagnosed with moderate to severe right carpal tunnel syndrome and mild right ulnar neuropathy. Filing 117-2 at 4-5. Ellenbecker returned to see Bobenhouse in July 2010 complaining of numbness in some of his right

fingers, right neck and shoulder pain, and headaches near his right temple. Filing 117-2 at 5. Bobenhouse testified that the symptoms Ellenbecker complained of in 2017 were similar to those he had in 2010. Filing 99-6 at 4.

Anne Bruna, APRN, also treated Ellenbecker for nerve pain and headaches. She testified that on April 6, 2015, Ellenbecker complained of "very brief lightning type pain around his right temple, triggered by eye movements." Filing 117-3 at 4. Ellenbecker told Bruna that the pain had been present intermittently for a couple of years. Filing 117-3 at 4. She diagnosed him with right-sided headaches and referred him to a neurologist. Filing 117-3 at 4; Filing 128-4 at 3. On April 16, 2015, Bruna called to follow up with Ellenbecker and he complained of "persistent, very brief, shooting nerve type pain that starts on his right temple and shoots around his right eye, sometimes down into his [cheek]." Filing 117-3 at 5.

In October 2015, Nanda Kumar, M.D. (a board-certified neurologist) evaluated Ellenbecker on Bruna's referral. Filing 128-4 at 3. Dr. Kumar diagnosed Ellenbecker with atypical facial pain/trigeminal neuralgia. Filing 128-4 at 5-6. The trigeminal nerve is anatomically distinct from the occipital nerve. Filing 128-4 at 6. Kumar testified that the symptoms he treated Ellenbecker for in 2015 were not consistent with occipital neuralgia. Filing 128-4 at 6.

Ellenbecker testified that his prior symptoms had gone away by the time of his 2017 injury. *See* filing 102-2 at 10. He wasn't having headaches, and could not recall having any symptoms related to his carpal tunnel. Filing 102-2 at 10. Aside from his back being a little sore after a ride, he testified that before March 5 he felt good and did not have to restrict his activities. Filing 102-2 at 10.

EXPERT OPINIONS – MEDICAL

Both parties also retained experts to review Ellenbecker's medical records and provide opinions about the cause of his occipital neuralgia. Ellenbecker retained Bennett Machanic, M.D., a retired board-certified neurologist. *See* filing 99-8 at 5, filing 99-7 at 4. And BNSF retained George Greene, M.D., a neurosurgeon specializing in treatment of the brain, spine, spinal cord, and peripheral nerves. Filing 99-9 at 2.

Dr. Machanic reviewed medical records from Dr. Bobenhouse, Dr. Kumar, and the Mayo Clinic, among others, and the deposition testimony of Dr. Whealy, Dr. Kumar, and nurse practitioner Bruna. *See* filing 99-8 at 5-6. He also examined Ellenbecker on January 29, 2020. Filing 99-8 at 7. Machanic testified that the cause of Ellenbecker's occipital neuralgia was the March 5, 2017 movement that Ellenbecker experienced traveling over the West KAAPA switch and crossing. Filing 99-8 at 9. According to Machanic the movement stretched Ellenbecker's occipital nerve and damaged the superficial portions of the nerve which then never fully healed. Filing 99-8 at 9. And Machanic opined that Ellenbecker cannot safely return to work as a locomotive engineer. Filing 107-4 at 9; filing 107-5 at 3.

Dr. Greene also reviewed Ellenbecker's medical records and Dr. Whealy's deposition testimony. *See* filing 99-9 at 2-3. Greene agrees that Ellenbecker had occipital neuralgia and that it was caused by the incident on March 5, 2017. Filing 99-9 at 3-4. Greene also opined that Ellenbecker may have "had a preexisting condition or tendency toward occipital neuralgia or an occipital type headache," but that "his event of [March 5] does seem to have been the provoking factor for him to develop a true diagnosis of occipital neuralgia." Filing 99-9 at 4; *see also* filing 117-4 at 4. But Dr. Greene expressed reluctance

at deeming Ellenbecker unable to do his job without a functional capacity evaluation. *See* filing 99-9 at 5.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

- 20 -

III. DISCUSSION

1. NEGLIGENCE UNDER FELA

FELA provides railroad employees with a federal cause of action for injuries "resulting in whole or in part from the negligence" of the railroad. 45 U.S.C. § 51. FELA is to be liberally construed, but it is not a workers' compensation statute, and the basis of liability is "negligence, not the fact that injuries occur." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). So, a plaintiff must prove the customary common law elements of a negligence claim: duty, breach, foreseeability, and causation. *Crompton v. BNSF Ry. Co.*, 745 F.3d 292, 296 (7th Cir. 2014); *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006). However, it is well established that the quantum of evidence required to establish liability in a FELA case is much less than an ordinary negligence action. *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 896 (8th Cir. 2012). And the jury's role in determining whether an employer has breached its duties under FELA has been repeatedly emphasized. *Ackley v. Chicago and North Western Transp. Co.*, 820 F.2d 263, 267 (8th Cir. 1987); *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506-07 (1957).

The statute imposes upon employers a continuous duty to provide a reasonably safe place to work. *Cowden*, 690 F.3d at 889. This duty is non-delegable, and increases as the risk to the employee increases. *Francisco v. Burlington N. R.R. Co.*, 204 F.3d 787, 789 (8th Cir. 2000). The railroad's conduct is measured by the degree of care that persons of ordinary, reasonable prudence would use under similar circumstances, and what would be anticipated as a result of a particular condition. *Ackley*, 820 F.2d at 267. In other words, the employer's duty under FELA to maintain a safe workplace turns in a general sense on the reasonable foreseeability of harm. *Peyton v. St. Louis Southwestern Ry. Co.*, 962 F.2d 832, 833 (8th Cir. 1992); *see Burckhard*

*v. BNSF Ry. Co.*, 837 F.3d 848, 853-54 (8th Cir. 2016); *Cowden,* 690 F.3d at 896. Thus, an employer is not liable if it had no reasonable way of knowing about the hazard that caused the employee's injury. *Peyton*, 962 F.2d at 833; *see Richardson v. Mo. Pac. R.R. Co.*, 677 F.2d 663, 665 (8th Cir. 1982).

In its motion for summary judgment, BNSF argues that the West KAAPA switch and crossing did not pose an unreasonable risk of injury and was safe. Filing 101 at 15. BNSF also argues that it did not know of and could not reasonably foresee a risk of injury resulting from locomotive sway as it traveled over the switch. *See* filing 101 at 19-21

Ellenbecker, however, moves for partial summary judgment on the issue of negligence arguing that BNSF failed to comply with one or more FRA regulations and is therefore negligent per se. Filing 109 at 1-2. In particular, Ellenbecker argues that the ballast around the switch and crossing was not properly draining in violation of 49 C.F.R. § 213.103 which provides:

> Unless it is otherwise structurally supported, all track shall be supported by material which will —
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
> (c) Provide adequate drainage for the track; and
> (d) Maintain proper track crosslevel, surface, and alinement.

Filing 109 at 14, 18-22.

And Ellenbecker argues that even if the gage of the track and alignment technically complied with the minimum requirements under 49 CFR §

- 22 -

213.109(b)(1),[8] that when combined with the fouled ballast, the gage conditions at the switch and crossing violated 49 C.F.R. § 213.1(a), which provides:

> This part prescribes minimum safety requirements for railroad track that is part of the general railroad system of transportation. In general, the requirements prescribed in this part apply to specific track conditions existing in isolation. Therefore, a combination of track conditions, none of which individually amounts to a deviation from the requirements in this part, may require remedial action to provide for safe operations over that track. This part does not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part.

See filing 109 at 17, 24-25.

Under FELA, a railroad may be liable for breach of a statutory duty. *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432, (1958). And if a plaintiff proves the railroad violated a statutory duty, then the plaintiff need not prove the elements of foreseeability, duty or breach. *Miller v. Union Pac. R.R. Co.*, 972 F.3d 979, 984 (8th Cir. 2020). Violation of a safety statute creates liability under FELA without regard to whether the injury flowing from the breach was

---

[8]      (b) Each 39–foot segment of track shall have at a minimum—

(1) A sufficient number of crossties that in combination provide effective support that will—

(i) Hold gage within the limits prescribed in § 213.53(b);

(ii) Maintain surface within the limits prescribed in § 213.63; and

(iii) Maintain alinement within the limits prescribed in § 213.55; . . .

49 C.F.R. § 213.109(b)(1).

the injury the statute sought to prevent. *Kernan*, 355 U.S. at 433. In other words, a railroad's violation of a safety statute is negligence per se. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 n. 12 (2011); *Miller*, 972 F.3d at 984. And a regulation promulgated by the FRA is deemed to be a safety statute under the Federal Railroad Safety Act.[9] *See* 45 U.S.C. § 54a; *Miller*, 972 F.3d at 984.

(a) Negligence Per Se under 49 C.F.R. § 213.103 - Ballast

Because Ellenbecker need not prove the customary elements of duty, breach, and foreseeability if BNSF is negligent per se, the Court will resolve Ellenbecker's partial motion for summary judgment first. And the Court will start with the argument that BNSF violated the ballast requirements found in 49 C.F.R. § 213.103.

Ellenbecker argues that BNSF knew in 2015 that the West KAAPA crossing needed maintenance and allocated funds to that end. *See* filing 121 at 29. And he suggests that the April 2016 email that the crossing needed attention and the August 2016 rough track report from Amtrak are more evidence of chronic problems near the switch and crossing. *See* filing 121 at 29. Ellenbecker further relies on the photographs taken on March 6 showing mud, and inspector Brisbin's testimony that the ballast at the crossing had been fouled well before his April 2017 report. *See* filing 109 at 18-22. Ellenbecker

---

[9]     The FRA is authorized to prescribe regulations and issue orders for every area of railroad safety. *In re Derailment Cases*, 416 F.3d 787, 793 (8th Cir. 2005). The authority originates in the Federal Railroad Safety Act, which authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103. The Secretary has delegated to the FRA the authority to "[c]arry out all functions vested in the Secretary by the [Railroad Safety Act]," with certain exceptions not applicable here. 49 C.F.R. § 1.49(m).

also notes that ballast rock was delivered to the crossing on March 3 to be used at and around the West KAAPA switch and crossing. Filing 109 at 19. Finally, Ellenbecker reasons that the significant repairs done to the crossing in April and May were to correct fouled ballast defects that existed on March 5.[10] *See* filing 109 at 23.

The Court agrees that the testimony, photographs, and circumstantial evidence show a problem with drainage and mud at the switch and crossing on or about March 5, 2017. But, there is a genuine dispute of material fact as to whether the crossing was *adequately* draining, as required by § 213.103, and whether the ballast was materially affecting track geometry and safety.

BNSF directs the Court's attention to the February 27 geometry car reports which indicate only yellow-tag gage deviations at or near the switch and crossing. In other words, BNSF argues the best evidence of the condition of the track on March 5 is the precise measurements provided by the geometry car that indicate the ballast was holding the track within FRA standards for gage and alignment. *See* filing 123 at 31-33. BNSF also relies on testimony from division engineer Boyer and its expert Dennin that mud and debris do not necessarily indicate a dangerous ballast condition. *See* filing 123 at 34.

From the record evidence, the Court cannot conclude as a matter of law that the ballast at the West KAAPA switch and crossing on the date of Ellenbecker's injury violated 49 C.F.R. § 213.103. There is no evidence of the exact condition of the ballast and track on March 5. Instead, there are

---

[10]     As previously noted, any evidence of subsequent remedial measures taken by BNSF is barred under Fed. R. Evid. 407. The Court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial. *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). So, the repairs done in April and May will not be considered.

geometry car measurements from February 27, six days before, indicating the track geometry was within FRA minimum standards. Filing 102-7 at 8-10; filing 102-10. And there are photographs from March 6, the day after, of mud at the crossing. *See, e.g.*, filing 110-5 at 17. There is testimony that the mud in the photos depicted a dangerous condition. *See* filing 102-17 at 110-11. But there is also testimony that you can't tell whether muddy ballast is dangerous from photos alone—you must take physical measurements of the track. *See* filing 102-16 at 12; filing 102-7 at 27; filing 110-6 at 8-9.

Brisbin testified that the fouled ballast he reported in April would have been there on March 5. Filing 102-16 at 5; filing 110-7 at 8. But he also testified there was nothing BNSF could have done about it because the ground was frozen. Filing 102-16 at 6. And FRA inspector Roskilly's report from April 6 documented other deviations near the switch and crossing, and improperly draining ballast between Minden and Funk, but did *not* mention drainage or ballast at the West KAAPA switch and crossing.[11] *See* filing 110-19 at 3, 5.

In sum, the evidence establishes a genuine dispute of material fact as to whether the ballast at the West KAAPA switch and crossing was fouled to the point of defect under § 213.103. And that dispute should properly be resolved by a jury. *Torgerson*, 643 F.3d at 1042; *Ackley*, 820 F.2d at 267.

(b) Negligence Per Se under 49 C.F.R. § 213.1(a) – Combination of Conditions

Similarly, the Court cannot conclude a combination of conditions existed that, as a matter of law, violated 49 C.F.R. § 213.1(a). For the reasons

---

[11]   The plaintiff argues that the West KAAPA switch and crossing could have been one of the "several locations" Roskilly reported were not draining properly. *See* filing 109 at 22-23. But even if that were true, Roskilly did not document the improper drainage as a defect under the FRA standards. *See* filing 110-19 at 5.

explained above, the record evidence is unclear as to the safety of the ballast at the switch and crossing on March 5. And the evidence from the February 27 geometry car and the February 28 vehicle/track interaction car shows the switch and crossing complied with FRA geometry standards and produced locomotive movement in a normal range. *See* filing 102-10; filing 102-25 at 2-3.

The plaintiff relies on a safety advisory issued by the FRA in 2015 addressing the risk of derailment created by unresolved ballast conditions coupled with other track conditions, such as geometry deviations. *See* filing 109 at 25; filing 110-21. In pertinent part, the safety advisory states:

> FRA believes that a location with a combination of a ballast defect with a marginal geometry condition [one that does not exceed the allowable threshold for the designated class track, i.e. a yellow tag] warrants *additional monitoring, more restrictive remedial action, or both*, to correct or safely compensate for the combined defect and condition.

Filing 110-21 at 3 (emphasis added). The safety advisory also emphasizes that track inspectors must "exercise their technical knowledge and professional experience," to "recognize and assess" safety risks posed by ballast defects combined with geometry conditions. Filing 110-21 at 3-4. But the existence of the advisory alone does not mean that the combination of conditions at *this* switch and crossing violated FRA standards. It merely provides additional guidance to railroads as to what *can* happen and what inspectors *should* look for.

The defendant argues that Brisbin did use his knowledge and experience to assess the safety risk posed by the ballast and geometry conditions at the

switch and crossing. *See* filing 123 at 35. And BNSF points to testimony from Brisbin that even though he knew the ballast was dirty and geometry conditions existed around the time of Ellenbecker's injury, that he did not believe the track was unsafe. *See* filing 123 at 35; filing 102-16 at 9. Furthermore, BNSF suggests that Brisbin was engaged in additional monitoring of the crossing and did report the ballast condition on April 4 when he believed it could be fixed. *See* filing 123 at 34-35. BNSF also points to testimony from its expert, Dennin, that in his experience as an FRA track inspector he could "count on one hand the number of [49 C.F.R. §] 213.1 deviations ever written. It's a rarity." Filing 123 at 36; filing 102-19 at 7.

The Court credits the evidence raised by BNSF as creating a genuine dispute of material fact as to whether the conditions at the switch and crossing on March 5 violated 49 C.F.R. § 213.1(a). The plaintiff's argument is essentially that he would not have been injured had there not been a combination of track conditions that caused the violent jerking he experienced. But Ellenbecker's reasoning requires the Court to credit Hansen's and his own testimony over the testimony of BNSF's witnesses and experts. And that is a job reserved for a jury. *Torgerson*, 643 F.3d at 1042; *Ackley,* 820 F.2d at 267.

Because genuine issues of material fact exist regarding both of Ellenbecker's negligence per se arguments, the plaintiff's partial motion for summary judgment on the issue of negligence will be denied.

### (c) BNSF's Motion for Summary Judgment on Negligence

The Court now moves to BNSF's motion for summary judgment. BNSF argues that the West KAAPA switch and crossing did not pose an unreasonable risk of injury and was safe. Filing 101 at 15. To support its argument, BNSF points to testimony from Brisbin, Hansen and Ellenbecker himself that movement over a switch is normal. Filing 101 at 16. And each testified they

did not believe it was unsafe for trains to travel over the West KAAPA switch. Filing 101 at 16. BNSF also reasons that the geometry car reports from February 27, which contained no red tags, objectively support that testimony. Filing 101 at 16. Finally, BNSF points to the report and testimony from its biomechanical engineering expert, Weaver, that the movement Ellenbecker experienced on March 5 was minimal and consistent with other movements of everyday life. *See* filing 101 at 18.

BNSF also argues that it did not know of and could not reasonably foresee a risk of injury resulting from locomotive sway as it traveled over the switch. *See* filing 101 at 19-21. BNSF reasons that it did not receive a single rough track report about the switch, despite 10 to 15 freight and 2 passenger trains traveling over it every day. Filing 101 at 21. And BNSF argues that Brisbin's inspections, geometry car data and vehicle/track interaction reports all support that there were no known or reasonably discoverable defects in the switch. Filing 101 at 22.

But the plaintiff argues that because the switch and crossing were on a section of track designated as a key route, BNSF owed an increased duty of care in excess of the minimum FRA requirements. Filing 121 at 1-2; *see* filing 102-17 at 157; filing 102-20 at 28. And Ellenbecker insists that BNSF breached its duty in several ways. *See* filing 121 at 28. First, Ellenbecker reiterates his arguments that BNSF knew fouled ballast was a recurring issue at the crossing and suggests the yellow tag deviations only prove the ballast wasn't holding track geometry. *See* filing 121 at 30-3; filing 102-17 at 129-30, 145-47; filing 102-16 at 5, filing 110-7 at 5, 8. The plaintiff also emphasizes Brisbin's testimony that one of the reasons he did not report the fouled ballast at the crossing earlier than April was because he knew BNSF didn't have the staff required to fix it. Filing 121 at 31; filing 102-16 at 6.

Ellenbecker also criticizes BNSF's inspection protocols as too lax, emphasizing testimony from Brisbin that he was not held accountable for verifying yellow tags or riding his track. *See* filing 121 at 32-34. So, according to Ellenbecker, a reasonable inference would be that if BNSF were performing more rigorous inspections, it would have found the conditions that caused his injury. *See* filing 121 at 34.

Finally, the plaintiff emphasizes the testimony provided by Hansen to dispute Weaver's conclusion that the movement Ellenbecker experienced was minimal. *See* filing 121 at 38. Hansen explained that a locomotive traveling 60 mph through a switch and then into wide gage track and immediately into a crossing could have produced the violent jerking Ellenbecker described. *See* filing 102-17 at 172-73. And of course, Ellenbecker testified that he experienced a "more violent" than usual side-to-side sway on March 5. *See* filing 102-2 at 15, 18.

The aforementioned evidence, viewed in the light most favorable to Ellenbecker, reveals a genuine dispute of material fact that, once again, should properly be resolved by a jury. The Court concludes that a reasonable jury could believe Ellenbecker's characterization of the evidence: that the FRA regulations provide only the minimum requirements for track but do not always equate to safety, that the movement Ellenbecker experienced on March 5 was more violent than normal, that a combination of gage deviations and fouled ballast could have caused the violent movement, and that BNSF knew about the recurring fouled ballast condition well before March 5 and should have addressed it with a more permanent solution.

Similarly, a reasonable jury could decide that the geometry car and vehicle/track interaction reports provide the best evidence that the switch and crossing complied with FRA standards and were safe for train travel on March

5. But the point is that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Torgerson*, 643 F.3d at 1042. And so, BNSF's motion for summary judgment will be denied.

(d) Ellenbecker's Partial Motion for Summary Judgment on Causation

The plaintiff also moves for partial summary judgment on the issue of causation. The Court applies a relaxed standard of causation under FELA. *McBride*, 564 U.S. at 692. The test is simply whether employer negligence played any part, even the slightest, in producing the injury for which damages are sought. *Id.* Expert evidence is often required to establish the causal connection between the injury and alleged hazard "unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile." *Brooks v. Union Pac. R.R. Co.*, 620 F.3d 896, 899 (8th Cir. 2010) (quoting *Moody v. Me. Cent. R.R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987)). Because Ellenbecker's occipital neuralgia has no obvious origin, "expert testimony is necessary to establish even that small quantum of causation required by FELA." *Id.* (quoting *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994)).

Ellenbecker argues that the undisputed evidence from both parties' experts establishes that the movement he experienced on the train on March 5 caused his occipital neuralgia. Filing 98 at 1-2. But BNSF argues that Ellenbecker's medical history proves that he had right-sided painful headaches in his occipital region, right-handed tingling, and "brief lightning type pain" around his right temple well before the March 5 incident. *See* filing 116 at 18-19. So, BNSF reasons that if Ellenbecker had a pre-existing condition then the issue of causation and apportionment must be submitted to the jury. Filing 116 at 18. The Court disagrees.

A defendant cannot escape liability because a preexisting condition made a plaintiff more susceptible to injury. *Sauer v. Burlington N. R.R. Co.*, 106 F.3d 1490, 1495 (10th Cir. 1996). Rather, tortfeasors take their victims as they find them, a rule commonly referred to as the "eggshell skull" rule. *See Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807, 820-22 (7th Cir. 1985). But a corollary to this principle is that the *damages* of the eggshell skull plaintiff must be reduced to reflect the likelihood that he would have suffered the injury even if the defendant had not injured him. *Sauer*, 106 F.3d at 1495; Lancaster, 773 F.2d at 822. In other words, a jury may apportion damages between a plaintiff's preexisting condition and the aggravation of that condition as a result of a defendant's negligence.[12] *See Sauer*, 106 F.3d at 1493-94; *Maurer,* 668 F.2d at 100; *McLaughlin,* 300 P.3d at 934-36.

---

[12]    Ellenbecker argues that an apportionment of damages instruction is inappropriate in this case and contends that his prior history of right-sided headaches, numbness, tingling and neurologic pain cannot be linked to a preexisting occipital nerve injury. *See* filing 127 at 18. He points to testimony from Dr. Greene that Ellenbecker's prior trigeminal neuralgia diagnosis is distinct and totally unrelated to his current occipital neuralgia diagnosis. Filing 127 at 18; filing 128-6 at 5. Dr. Greene also declined to testify that Ellenbecker was predisposed to injuring his occipital nerve as a result of his prior diagnoses. Filing 128-6 at 4.

It is BNSF's burden to prove the extent of the damages that the preexisting condition would have inevitably caused. *Maurer v. United States*, 668 F.2d 98, 100 (2d Cir. 1981). And several federal courts have held that a plaintiff's damages may not be reduced due to an asymptomatic or latent preexisting condition. *See McLaughlin v. BNSF Ry. Co.*, 300 P.3d 925, 936 (Colo. App. 2012) (cataloging cases).

Based on the record presently before the Court, it cannot say that BNSF has carried its burden on apportionment. Ellenbecker's last treatment for any headaches or neurologic pain was in 2015, two years before the March 5 incident. *See* filing 117-5 at 3. And Ellenbecker testified his 2015 pain was different than the pain he experiences now. Filing

Here, BNSF tries to conflate the issue of apportionment, which relates to the jury's damages calculation, with the issue of causation, which relates to establishing BNSF's liability. And BNSF does not deny that both its own expert, Dr. Greene, and Ellenbecker's expert, Dr. Machanic, unequivocally testified that the March 5, 2017 incident caused Ellenbecker's occipital neuralgia. Filing 99-9 at 3-4; Filing 99-8 at 9. And that testimony is more than enough to satisfy the causation requirement under FELA that the March 5 incident played any part in producing Ellenbecker's injury. *See McBride*, 564 U.S. at 692.

Accordingly, Ellenbecker's partial motion for summary judgment on the issue of causation will be granted.

## 2. BNSF's Motions to Exclude or Limit Expert Opinions

BNSF moves to exclude or limit the opinion and testimony of Ellenbecker's safety expert, Brian Hansen, because according to BNSF (1) his opinions are speculative and (2) his methodology is unreliable. Filing 104 at 12-16. And BNSF moves to exclude or limit the opinion and testimony of Ellenbecker's medical and causation expert, Dr. Bennett Machanic, because (1) his methodology is unreliable and (2) his opinions lack sufficient foundation. Filing 106 at 1. Both motions will be denied.

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

---

117-5 at 3. Ellenbecker's testimony is consistent with the testimony of both Dr. Kumar, his treating physician, and Dr. Greene, BNSF's expert. *See* filing 128-4 at 6; 128-6 at 5. Frankly, the Court is doubtful that BNSF can carry its burden. But BNSF may, if it chooses, fully brief this issue before trial in support of a request to instruct the jury on apportionment of damages.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702 the trial judge acts as a "gatekeeper" screening evidence for relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993); *Polski v. Quigley Corp.*, 538 F.3d 836, 838-39 (8th Cir. 2008).

The objective of the *Daubert* inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. 2015). And in order to be admissible, expert testimony must be both relevant to a material issue and reliable. *Daubert*, 509 U.S. at 591; *see also Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1120 (8th Cir. 2006); *see* Fed. R. Evid. 702.

*Daubert* established a non-exhaustive checklist for trial courts to use in assessing the reliability of expert testimony, including whether the theory or technique can and has been tested, whether it has been subjected to peer review, whether there is a high known or potential rate of error, and whether the theory or technique enjoys general acceptance within a relevant scientific community. *See U.S. v. Holmes*, 751 F.3d 846, 850 (8th Cir. 2014) (citing *Daubert*, 509 U.S. at 592-94). And for the purposes of evaluating the relevance of expert testimony, the Court must determine whether the expert's reasoning

or methodology was applied properly to the facts at issue. *Daubert,* 509 U.S. at 580. To that end, expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case, is inadmissible. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

But Rule 702 and *Daubert* still call for the liberal admission of expert testimony. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). And judges are not meant to weigh or assess the correctness of competing expert opinions. *Id.* As long as an expert's testimony rests upon good grounds, based on what is known, it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the Court at the outset. *Id.*

To that end, generally the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. *Bonner v. ISP Techs, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded. *Id.* at 930.

### (a) Hansen's Opinion

BNSF asserts that Hansen's opinion must be excluded or limited for several reasons: (1) because it is overly speculative, (2) because Hansen is not qualified to opine regarding the track conditions that led to the violent movement Ellenbecker says he experienced, and (3) because Hansen may not opine to the ultimate legal issue of whether or not the track violated FRA standards. Filing 104 at 2-3. The arguments will be addressed in turn.

First BNSF argues that Hansen's opinion that the West KAAPA switch and crossing were unsafe is "pure speculation." Filing 104 at 12. BNSF asserts the February 27 geometry car report with only two yellow tags is the most

accurate evidence of the condition of the track on March 5 and so any opinion that the track was unsafe is merely speculative. *See* filing 104 at 12-14. But as the Court has already explained, the geometry car data is not determinative of the condition of the track on March 5; it is one piece of evidence.

Ellenbecker explains that Hansen did not speculate, but relied on a variety of evidence to form his opinions. *See* filing 125 at 4. That evidence included photographs taken on March 6, BNSF's geometry car data showing repeat yellow tag deviations, roadmaster Cowper's admission that inadequate drainage can lead to mud and debris in the track, Ellenbecker's testimony about what he saw and felt riding over the switch and crossing, BNSF emails indicating recurring ballast problems at the crossing, and inspector Brisbin's testimony about his inspection practices. *See* filing 102-18 at 3-5. And it was those facts, coupled with Hansen's knowledge of the FRA minimum safety requirements *and* industry best practices, that led him to conclude that BNSF had violated its duty of care and failed to provide Ellenbecker with a reasonably safe workplace. *See* filing 102-18 at 2-3.

The Court concludes Hansen is not being overly speculative. Rather, Hansen has drawn inferences from *all* of the available evidence, not just the geometry car report. Then, based on his technical experience, education and training, he opined on the safety of the track on March 5. That is precisely the type of testimony that Rule 702 contemplates. BNSF is ultimately trying to discredit Hansen's opinion based on the facts he relied on, not his methodology. And those arguments go to credibility and weight, not admissibility. *See Bonner*, 259 F.3d at 929. That is precisely the reason for vigorous cross examination.

The Court is also satisfied that Hansen's methodology is reliable. Hansen explained in his expert report that he considered BNSF's supervision and

management practices, employee behavior, and the physical environment of the track in arriving at his opinions. Filing 102-18 at 2. In addition, he reviewed the pleadings, deposition transcripts, documents produced by BNSF, and photographs of the switch and crossing to develop his understanding of the facts. Filing 102-18 at 1-3. Then, relying on his 21 years of experience and technical training in track inspection, repair, and railway safety reached his conclusions. And methodology like Hansen's has been found reliable in other railroad cases. *See Cowden v. BNSF Ry. Co*, No. 4:08-CV-1534, 2013 WL 5442926, at *4-5 (E.D. Mo. Sept. 30, 2013). Not to mention that BNSF's expert, Fred Dennin, used a substantially similar methodology to reach his opinions. *See* filing 102-20 at 1-7, 19.

BNSF also attempts to discredit Hansen's opinions because he does not have "any post-secondary education," let alone a "degree in engineering, biomechanics, or medicine." Filing 104 at 3. So, BNSF argues that Hansen cannot opine on how the movement Ellenbecker experienced occurred or whether it could have caused his injury. The Court is unpersuaded.

Under the plain text of Rule 702, an expert may be qualified "by knowledge, skill, experience, training, *or education*." (emphasis supplied). And the rule "does not rank academic training over demonstrated practical experience." *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012). Hansen worked for Union Pacific Railroad for 21 years and repaired track, supervised others who repaired track, inspected track, and managed inspectors. *See* filing 102-17 at 7-19. Over those 21 years Hansen undoubtedly gained knowledge, skill, experience and training to support his opinions on the safety of the West KAAPA switch and crossing. In addition, Hansen testified that he rode in locomotives "a lot" over those 21 years, and experienced many

different types of train movement, including rough track. Filing 102-17 at 164-65.

It is based on his technical knowledge, skill, experience and training in track maintenance and safety, and his experience in locomotive movement, that Hansen provided an explanation of what likely happened *to the train* on March 5 to result in a sudden movement. *See* filing 102-17 at 166-68, 171-72. Just because Hansen cannot say with mathematical certainty how much the train moved does not make his testimony inadmissible. *See* Bonner, 259 F.3d at 930. Again, Hansen's opinions should be tested through the adversarial process, competing expert testimony, and cross-examination. *See* Johnson, 754 F.3d at 562.

Finally, BNSF argues that Hansen cannot provide opinions that amount to legal conclusions: whether the track violated federal safety regulations, including 49 C.F.R. § 213.1(a). *See* filing 104 at 16-17. Ellenbecker responds indirectly to this argument in a footnote and cites Fed. R. Evid. 704(a) for the proposition that "an opinion is not objectionable just because it embraces an ultimate issue," and looks to the Court for guidance. *See* filing 125 at 12.

When testifying to a party's negligence, experts may refer to regulations in addition to their industry experience. *See* Haager v. Chicago Rail Link, LLC, 232 F.R.D. 289, 295 (N.D. Ill. 2005); Cowden, 2013 WL 5442926, at *6. But an expert may not opine as to whether a party *violated* a regulation. *See* Southern Pine Helicopters, Inc. v. Phx. Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 1995). Whether a party violated a federal regulation is a question of law and thus the subject of the Court's instructions, not the subject of expert testimony. *Id.*; United States v. Klaphake, 64 F.3d 435, 438-39 (8th Cir. 1995).

In Hansen's report he concluded:

> [BNSF] failed to follow the recommended practices of AREMA and
> the maintenance and inspection standards of care that are custom
> and practice of the industry that are listed throughout my report,
> which include:
>
> > . . .
> >
> > ➢ [FRA] Part 213 Track Safety Standards Parts 213.1(a),
> > 213.5(a), 213.55, 213.63, 213.103(c)(d), and 213.233(b).

Filing 102-18 at 26. And those conclusions are impermissible conclusions of law. *See Southern Pines Helicopters,* 320 F.3d at 841.

Hansen may, however, refer to the FRA standards as providing part of the applicable standard of care. *See Haager,* 232 F.R.D. at 295. And Hansen may also opine as to whether BNSF acted prudently or provided Ellenbecker with a reasonably safe place to work. *See Wood v. Minn. Mining & Mfg. Co,* 112 F.3d 306, 310 (8th Cir. 1997); *Cowden v. BNSF Ry. Co.*, No. 4:08-CV-1534, 2010 WL 3306889, at \*4 (E.D. Mo. Aug. 19, 2010), *aff'd in part, rev'd in part on other grounds*, 690 F.3d 884 (8th Cir. 2012). Those are the ultimate issues under Rule 704(a), not whether BNSF violated FRA standards.

Accordingly, BNSF's motion to exclude or limit the opinion of Brian Hansen will be granted as to any opinion that BNSF violated FRA regulations. Otherwise, BNSF's motion will be denied.

### (b) Machanic's Opinion

BNSF moves to exclude some of the opinions of Ellenbecker's medical expert, Dr. Bennett Machanic—specifically, (1) that Ellenbecker is unable to return to work at BNSF as an engineer, (2) that Ellenbecker's right arm pain and/or numbness was caused, in whole or in part, by the March 5 incident, and (3) that Ellenbecker's tinnitus was caused, in whole or in part, by the March 5

incident. Filing 106 at 1-2. Ellenbecker concedes BNSF's second and third arguments. *See* filing 111 at 2. So, the only remaining issue is the admissibility of Dr. Machanic's opinion that Ellenbecker cannot safely return to work.

BNSF first argues that Machanic did not apply a reliable methodology when forming the opinion that Ellenbecker cannot return to work. Filing 106 at 8. But the Court finds no support for this argument in BNSF's brief or in the relevant case law. *See* filing 106 at 8-10. Machanic is a retired board-certified neurologist. Filing 99-7 at 4. And Dr. Machanic reviewed Ellenbecker's medical records, performed an independent medical exam, and reviewed deposition testimony from several medical providers. *See* filing 99-8 at 5-7. Aside from additional *facts* that BNSF believes Machanic should have considered, it cannot identify a problem with the general medical methodology used by Machanic. *See* filing 106 at 8-10. So, the Court determines that BNSF's argument is without merit.

And BNSF's attacks on the factual basis for Machanic's opinion do not affect admissibility. Specifically, BNSF argues that Dr. Machanic had insufficient data to support that Ellenbecker's pain is temporarily immobilizing. *See* filing 106 at 9. And BNSF takes issue with Dr. Machanic opining that Ellenbecker could not safely return to work as an engineer before receiving a job description. *See* filing 106 at 9. Those are precisely the type of challenges that can be raised on cross-examination and do not affect admissibility. *Bonner*, 259 F.3d at 929.

Machanic explained that he did not think it was safe for Ellenbecker to return to work because he experiences 30-50 painful shocks every day that come without warning. *See* filing 107-4. And according to Ellenbecker and Machanic, the pain can sometimes be intense and immobilizing. *See* filing 107-4 at 7-9; filing 107-2 at 44-45. So far, Ellenbecker's pain has not responded well

to treatment. *See* filing 107-4 at 9. And it is Machanic's opinion that this unpredictable, intense, immobilizing pain would prevent Ellenbecker from being able to multi-task reliably and could create a significant safety risk should he return to work. *See* filing 107-2 at 40-46.

The Court does not find Machanic's opinion "so fundamentally unsupported that it can offer no assistance to the jury," and so it will not be excluded. *See Bonner*, 259 F.3d at 930. Accordingly, BNSF's motion to exclude or limit the testimony of Dr. Machanic will be granted as to Machanic's opinions concerning the cause of Ellenbecker's right arm pain/numbness and his right ear tinnitus. In all other respects, BNSF's motion will be denied.

Accordingly, this case will move forward to trial.

IT IS ORDERED:

1.  BNSF's motion for summary judgment (filing 100) is denied.

2.  BNSF's motion to exclude or limit the opinion of Brian Hansen (filing 103) is granted only as to Hansen's opinions that BNSF violated Federal Railroad Administration regulations. It is denied in all other respects.

3.  BNSF's motion to exclude or limit the opinion of Bennett I. Machanic, M.D. (filing 105) is granted only as to Machanic's opinions regarding the cause of Ellenbecker's right arm pain/numbness and tinnitus. It is denied in all other respects.

4.      Ellenbecker's motion for partial summary judgment on the
        issue of negligence (filing 108) is denied.

5.      Ellenbecker's motion for partial summary judgment on the
        issue of causation (filing 97) is granted.

Dated this 1st day of March, 2021.

                                    BY THE COURT:


                                    _____
                                    John M. Gerrard
                                    Chief United States District Judge